# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Amanda Wozniak, *et al.*,

      Plaintiffs,

      v.

Jan Zielinski, *et al.*,

      Defendants.

Case No. 1:14-cv-05009

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Amanda Wozniak, Robert Wozniak Jr., and their four minor children (collectively, "Plaintiffs") allege that their eviction from an apartment in the Village of Justice gave rise to: (1) various unconstitutional deprivations of their civil rights (Counts 1-4); (2) precipitated a series of common law torts, including conversion, trespass, and negligence (Counts 9-13); (3) constituted a breach of their contract with their landlord, Defendant Jan Zielinski ("Zielinski") (Count 14); and (4) created a claim for promissory estoppel (Count 15). First Am. Compl. [24] ¶¶ 39-105. Plaintiffs further allege that the Village of Justice is ultimately responsible for any ostensible constitutional violations (Counts 5-8). *Id.* ¶¶ 65-70. Federal jurisdiction arises under 28 U.S.C. § 1331, because Plaintiffs have multiple claims pursuant to 42 U.S.C. § 1983 ("Section 1983"); and this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

Defendants William R. Conrad, Barclay Murphy, Joseph Bonkowski (collectively, the "Officer Defendants"), the Justice Police Department, and the

Village of Justice (collectively, with the Officer Defendants, the "Village Defendants") move for summary judgment on all counts pending against them. Village Defs.' Mot. Summ. J. [79]. Zielinski moves for summary judgment and to join the summary judgment motion filed by the Village Defendants. Zielinski Mot. To Join and Summ. J. [83].[1] Plaintiffs also filed a motion for summary judgment on all counts, excepting their claims for breach of contract and promissory estoppel. Pls.' Mot. Summ. J. [84].

These respective motions are granted in part and denied in part. As explained below, the claims over which this Court is empowered to exercise original jurisdiction are dismissed with prejudice. In light of the nature of the remaining state law claims, their ease of resolution, and the procedural posture of this case, the Court declines to exercise supplemental jurisdiction over the same; accordingly, Plaintiffs' state law claims are dismissed without prejudice.

---

[1] The Court notes that Zielinski failed to comply with both the relevant Local Rules and this Court's Standing Orders regarding the proper form of summary judgment briefing. The Court is empowered to deny his motion on this basis alone. *See Union Oil Co. of Cal. v. John Brown E&C, a Div. of John Brown, Inc.*, No. 94-cv-4424, 1995 WL 354259, at *4 (N.D. Ill. June 9, 1995). In the interests of justice and judicial economy, however, the Court grants Zielinski's request to join the Village Defendants' Motion for Summary Judgment. Zielinski Mot. To Join and Summ. J. [83] ¶3. "Since the decision [regarding Zielinski] appears to be clear" with recourse to those filings and the parties' supplemental briefing, the Court elects to consider Zielinski's request for summary judgment now. *Henning v. Maywood Park Trotting Assoc., Inc.*, No. 02-cv-1481, 2004 WL 783201, at *1 (N.D. Ill. Jan. 12, 2004).

# I.    Background[2]

The Plaintiffs began renting an apartment (the "Apartment") from Zielinski on or around September 1, 2012.  PSOF ¶ 7.  Around April 23, 2013, Zielinski filed an eviction suit in the Circuit Court of Cook County against Mr. and Mrs. Wozniak. *Id.* ¶ 24.  The state court in that case entered an Agreed Order for Possession (the "Order"), signed by Robert Wozniak, on May 7, 2013.  *Id.*  In that Order, the court found that Zielinski was "entitled to the possession of" the Apartment, and ordered that he "have and recover" the Apartment from Robert and Amanda Wozniak. DSOF Ex. 2.  The court stayed the enforcement of the Order until May 27, 2013, and Plaintiffs agreed to leave the apartment by that time.  *Id.*; PSOF ¶ 24.

At some point prior to May 28, 2013, Amanda Wozniak and her children left the Apartment and began to stay with her mother.  DSOF Ex. 3 at 19-20.  During this time, Amanda would periodically return to the Apartment to gather their belongings in order to bring them to her mother's home.  *Id.*  Additionally, there is some dispute regarding a conversation that allegedly occurred prior to May 27, 2013, between some combination of Robert Wozniak, Amanda Wozniak and Zielinski.  According to Robert, he spoke with Zielinski in the basement of the Apartment, and Zielinski said the Wozniaks could have a little more time to move out—but no more than two weeks.  PSOF Ex. C at 20-21.  Robert did not remember, however, if that conversation occurred before or after May 23, 2013.  *Id.* at 21.

---

[2] The facts are taken from the parties' Local Rule 56.1 statements.  "DSOF" refers to the Village Defendants' statement of undisputed facts [81], with Plaintiffs' responses where applicable [95]. "PSOF" refers to Plaintiffs' statement of undisputed facts [86], with the Village Defendants' responses where applicable [91].  "PSOAF" refers to Plaintiffs' statement of additional facts [94], with the Village Defendants' responses where applicable [97].

Amanda described a similar conversation in her deposition, but claimed that it took place in the laundry room, between herself and Zielinski. PSOF Ex. B at 75-76. In that conversation, which Amanda said happened at some time "before the date [they] were supposed to get out" of the Apartment, Amanda told Zielinski they needed "more time," and he said "only two more weeks." *Id.*

A.    **The Events of June 2, 2013**

On June 2, 2013, at approximately 2:46 PM, Frank Zielinski (Defendant Zielinski's son) contacted the Justice Police Department ("JPD") concerning the Apartment. PSOF ¶ 27. Officers Conrad and Bonkowski responded to the call, and were met by both Zielenskis upon arriving at the Apartment. *Id.* ¶¶ 27-28. Frank Zielinski showed the officers the Agreed Order for Possession, and asked that they do a premises check to determine if the Plaintiffs were still living at the property. *Id.* ¶ 28. Defendant Zielinski provided a key to the Apartment, but it is unclear who exactly opened the door. *Compare* PSOF Ex. E at 27 ("We [ambiguous in original] cracked the door open.") *with* DSOF ¶ 21 "([T]he Landlord and his son then opened the door with their key."). Before entering, the officers knocked twice on the door and announced "Police Department. Is anyone home?" *Id.* ¶¶ 19-20. After the door was opened, the officers announced "Justice Police Department, is anybody home? Answer now if there's anybody home and let us know." *Id.* ¶ 22. After once again getting no response to their calls, the officers entered the unit. *Id.* ¶ 23.

Upon entry, it was discovered that no one was present in the Apartment. PSOF ¶ 30; DSOF ¶ 24. According to a contemporaneous police report, the officers

"observed the apartment uninhabitable due to the extremely deplorable conditions . . . observed dirty clothes, garbage, old food, dirty dishes, broken furniture, broken toys and doors off hinges, throughout the living room, kitchen, kitchen table, kitchen counter, both bedrooms, hallway and bathroom, as if the apartment had been abandoned . . . no clean linens on the mattresses which were cluttered with clothes and closet doors, and clothes and toys in the crib . . . two dogs in a cage in the kitchen and a guinea pig in a cage in a rear bedroom. The dogs did not have tags, food, or water, but the guinea pig did." PSOF Ex. I at 1-2. Further, both Conrad and Bonkowski testified that the Apartment smelled of urine or feces. PSOF Ex. E at 29-30; Ex. G at 40.

The descriptions given by Conrad and Bonkowski match the photographs of the Apartment submitted by the Defendants as part of Exhibit 10 to the DSOF. Those photographs show:

- A dining table and kitchen counter piled high with garbage and miscellaneous personal items, such that the surface is barely visible.
- A crib in the second bedroom overflowing with plastic bags, stuffed animals, and miscellaneous belongings. In that same bedroom the floor is covered with clothes and personal belongings, and the closet was missing its doors.
- In the first bedroom there is a bunk bed frame with no mattresses, and the floor is completely covered by garbage bags, toys, a cage and other possessions. Both closet doors are off the tracks, and propped up haphazardly throughout the room.
- The living room has no furniture, and there is debris scattered across the floor.
- The bathroom has towels, clothes and miscellaneous items scattered on the floor, across the back of the toilet, and on top of the vanity.

Meanwhile, in the kitchen there were two dogs in the same cage. DSOF ¶ 29. The dogs had no collars, tags, food, or water. *Id*. Officer Conrad testified, however, that he did not observe any urine or feces in the dog cage. PSOF Ex. E at 29:16-23. When asked if the animals appeared to be uncared for, Conrad testified "Yes," given the lack of food or water. PSOF Ex. E at 49. He also said, however, that the dogs did not appear to be sick. *Id*. at 48:23-49:1.

Based upon the condition of the Apartment and their determination that the Apartment was abandoned, the officers decided that the two dogs and guinea pig should be taken to animal welfare. DSOF ¶ 41; DSOF Ex. 13 at 44-45. The officers did not take any other property from the Apartment. DSOF ¶ 42. While attempting to load the dogs into their cruiser, one of the dogs escaped. *Id*. ¶ 43. After trying to catch the dog for 5-10 minutes, the officers lost sight of the dog. *Id*. ¶ 44. Officer Bonkowski then went back on patrol while Officer Conrad transported the second dog and guinea pig to animal welfare. DSOF ¶ 45. Due to the condition of the Apartment, Officer Conrad put the animals on confiscated hold, which required the owners to contact him before retrieval was permitted. *Id*. ¶ 46. Upon intake, the second dog's condition was listed as "normal." PSOF ¶ 38.

At around 5:00 p.m. Officers Bonkowski and Conrad returned to the Apartment. DSOF ¶ 48. The officers were approached by the Wozniaks, who were upset that their dogs were missing and asked to speak to a supervisor. *Id*. ¶ 49. It is unclear from the record what exactly Mrs. Wozniak told the officers regarding her living situation during this encounter. According to Mrs. Wozniak, she told the

officers "they couldn't do that, they had no right to do that, we still lived there." PSOF Ex. B at 61:1-3. According to Officer Conrad, Mrs. Wozniak "advised that they were in the process of moving out despite the—it was apparent that there was no moving equipment, no moving boxes or trucks or vans that would lead me to believe they are moving out. She also said they were not—her and the children were not living in the apartment." PSOF Ex. E at 62:10-16. According to the police report, the tenants "claim they, and their children, were not living in the apartment for 'several days' and furthermore claimed to be moving out despite no moving boxes or organization to the foulness inside the apartment . . . [they] claimed they had spoken with [the landlord] after [August 27] and supposedly advised him they were moving out this weekend." PSOF Ex. I at 2.

After speaking with Amanda Wozniak, Officer Conrad called animal welfare and released the confiscated hold on the animals. DSOF ¶ 50. At that time, around 5:00 p.m., the Wozniaks entered the Apartment. *Id.* ¶ 53. Corporal Zima also arrived around 5:00 p.m. in response to the Wozniaks' request for a supervisor, and was given permission by the Wozniaks to enter the Apartment. *Id.* ¶ 54. When he entered, the Apartment smelled like animal feces mixed with rotten food. *Id.* ¶ 55. Corporal Zima observed dog feces on the floor that had been there for a while, along with the various pieces of personal property previously described. *Id.* ¶ 56. After touring the Apartment, and hearing what Officers Conrad and Bunkowski had done, Zima informed the officers that they had made the correct decision. PSOF Ex. E. at 67:11-17; Ex. M at 34:16-21.

Officer Conrad contacted the Department of Child and Family Services regarding the condition of the Apartment, but the Department told him it could not investigate without proof that children were living in the Apartment. DSOF ¶¶ 57-58. The missing dog was found at Davern's Tavern while Corporal Zima was on the premises of the Apartment, so he accompanied Amanda Wozniak to retrieve the dog. PSOF ¶ 48. After the dog was found, Officers Bonkowski and Zima left the scene. DSOF ¶ 59.

At approximately 9:30 p.m., Jan and Frank Zielinski returned to check on the Apartment. *Id*. ¶ 60. The Zielinskis then called the police because they saw a light on in the Apartment and found the front door hanging off its frame, connected by a chain lock. *Id*. ¶ 60. Officer Lenos, Officer McNamara, and Sergeant Schuerg responded to the Zielinskis' call for a premises check and met Frank Zielinski in the parking lot. *Id*. ¶ 61. After Zielinski showed them the original Agreed Order for Possession of the Apartment, the officers went up to the Apartment and reported that no one was inside the premises. *Id*. ¶ 62. After the officers left, Zielinski and his son returned to their home, retrieved a new pair of locks, and installed the same at the Apartment to secure the premises. *Id*. ¶63. According to Zielinski, this was something the "police" told them to do. PSOF Ex. D at 69:23; 72:12-21; 74:21-23.

Officer Lenos, Officer McNamara, and Sergeant Schuerg admit to being on the scene on June 2, 2013. PSOAF ¶7. McNamara and Schuerg testified they would not have advised a landlord to change the locks. *Id*. Regarding whether he informed the Wozniaks about the changed locks, Zielinski said: "No. We didn't call

them because at the prior times or earlier days we called and nobody ever answered the phone.  We didn't have any contact with them whatsoever.  We didn't know if they lived there or not, if they are still there or not.  That's why we called the police."  PSOF Ex. D at 73:17-22.

### B.      The Events of June 3, 2013

On June 3, 2013, Plaintiffs returned to the Apartment to attempt to retrieve the rest of their property.  PSOF ¶ 54.  The Plaintiffs then drove to Zielinski's home where they spoke to Frank Zielinski.  *Id*. ¶ 55.  Plaintiffs demanded access to the Apartment to pick up their belongings.  *Id*.  Frank Zielinski told Plaintiffs the locks had been changed, and their personal belongings were in the garbage.  *Id*.  Defendant Zielinski, through his son Frank, also refused Amanda Wozniak's demand for a key to the new locks.  *Id*.

### C.      The Events of June 4, 2013

On June 4, 2013, Amanda Wozniak returned to the Apartment with her grandmother and two of her children.  PSOF ¶ 56.  On the ground outside of the apartment building there were several items of personal property which belonged to the Plaintiffs.  *Id*. ¶ 57.  Additionally, Amanda Wozniak saw Zielinski's wife and daughter throwing Plaintiffs' property out of the third floor window.  *Id*. ¶ 58.  Amanda Wozniak demanded access to the Apartment, and the Zielinski family refused.  *Id*. ¶ 60.  Amanda Wozniak then called the Justice Police Department, and Defendant Murphy was sent to the scene for a stand-by "keep the peace" call.  PSOF

¶ 61; DSOF ¶ 64.[3]  Upon the arrival of Defendant Murphy, Amanda Wozniak complained that the Zielinskis had unlawfully entered the Apartment and removed her belongings.  DSOF ¶ 65.  Murphy testified, however, that he did not believe that Amanda Wozniak asked for his assistance in going up to the apartment.  PSOF Ex. F at 26:21-23.  At some point, Amanda Wozniak asked Murphy if he could sign a criminal complaint for trespass to residence by Zielinski.  PSOF ¶ 62.  Murphy declined, as he thought Zielinski lacked the requisite criminal intent.  PSOF Ex. F at 30-32.

Officer Murphy eventually spoke to Frank Zielinski, who provided the Agreed Order for Possession, signed by Robert Wozniak, stating that the Plaintiffs were to vacate the property by May 27, 2013.  DSOF ¶ 66.  Officer Murphy then mediated an agreement between Plaintiffs and Zielinski whereby the Wozniaks were allowed to access the Apartment and gather the rest of their belongings.  *Id.* ¶ 67.  During this exchange, Officer Murphy never went inside the Apartment, and he left five minutes after the agreement was reached.  *Id.* ¶ 69.  Plaintiffs claim that, during this exchange, they asked Officer Murphy to stop Zielinski's wife and daughter from going into the Apartment, but he would not do so.  PSOF ¶ 66; PSOF Ex. B at 130:24-131:7.  The Defendants deny this assertion, but the evidence they offer does not contradict Plaintiffs' claim.  *See* PSOF Ex. F at 25-26, 29.

---

[3] Plaintiffs claim that during that phone call the dispatcher informed Amanda Wozniak that she was not to go in the Apartment without a police escort, and that Defendant Murphy instructed her that she was not to enter the Apartment without permission of the landlord and local police.  *See* PSOF ¶ 61.  The evidence cited by the Plaintiffs, however, does not fully substantiate that assertion.  *See* PSOF Ex. B at 88:20-22, 91:10-14; Ex. F at 21:15-19; Ex. H at 70:15-16.  Indeed, the only proffered evidence in that regard is Amanda Wozniak's own conclusory affidavit.  PSOF Ex. K.

Later that same afternoon (June 4, 2013), Officer Murphy was dispatched back to the Apartment so that the Wozniaks could actually gather their belongings from the Apartment. DSOF ¶ 70. He retrieved the key to the Apartment from Zielinski and gave it to the Wozniaks, who began the process of moving the rest of the belongings out of the residence. *Id.* ¶ 71. Murphy stood by while the Wozniaks opened the Apartment to grab their belongings. *Id.* ¶ 72. Officer Murphy stayed for another five minutes after the Wozniaks received access to the Apartment, and then left the scene. *Id.* ¶ 73. Throughout the entire ordeal, Plaintiffs did not see any Justice Police Department officers remove any property from the Apartment. *Id.* ¶ 75.

### D. Defendants' Policies & Practices

None of the Officer Defendants received formal training or instruction regarding the eviction process in Cook County, Illinois. PSOF ¶ 15. The Officer Defendants also have not received formal training "regarding the validity" of court orders; however, the Officer Defendants are generally familiar with court orders through their experience as law enforcement agents. *Id.* ¶ 16. The Village Defendants have no formal policy for handling calls from landlords, nor do the Village Defendants have a formal policy regarding landlord/tenant disputes. *Id.* ¶¶ 17, 18. There are training programs, however, designed to teach officers to resolve disputes peaceably. *Id.*

Based upon his professional experience, Officer Murphy testified that "as law enforcement officers we don't get involved with evictions. They're held by Cook

County. It's initiated by the landlord through Cook County. We don't assist them in any way and they don't ask for our assistance." PSOF Ex. E at 7. For his part, Officer Bonkowski testified that while he had "assisted a landlord in removing a tenant" approximately ten times, his actions in a given situation "obviously vary with each circumstance." PSOF Ex. G at 13-14, 19-20.

## II.    Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," and the Court must "construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Liberty Lobby*, 477 U.S. at 255; *see also Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014).

## III.   Analysis

### A.    Defendant Zielinski Is Not An Appropriate Section 1983 Defendant

As a preliminary matter, the Court finds that Defendant Zielinksi is not amenable to suit on Counts 1 through 3. As they pertain to Defendant Zielinski, Count 1 alleges that he accomplished an unconstitutional seizure of the Apartment; Count 2 charges that he participated in an unconstitutional seizure of Plaintiffs'

persons; and Count 3 asserts that he partook in an unreasonable search of the Apartment.  First Am. Compl. [24] ¶¶ 39-64.  All three claims are made pursuant to Section 1983, which grants individuals "a private right of action for violations of the [Fourth and] Fourteenth Amendment[s]."  *Alcala v. Totaro*, No. 05-cv-3683, 2005 WL 3470293, at *3 (N.D. Ill. Dec. 16, 2005).

"[T]he defendants in § 1983 cases are usually government officials," and for good reason—"§ 1983 actions may only be maintained against defendants who act under color of state law."  *London v. RBS Citizens, N.A.*, 600 F.3d 742, 746 (7th Cir. 2010); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (holding that private persons are not subject to suit pursuant to Section 1983 for "merely private conduct, no matter how discriminatory or wrongful") (internal quotations and citations omitted).  While the Supreme Court has identified at least four discrete "tests" to determine when a private party can be characterized as having acted "under color of state law," the state action doctrine requires that a court "find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'"  *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823–24 (7th Cir. 2009) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).  The Seventh Circuit has previously affirmed decisions granting summary judgment to defendants when no reasonable fact finder could infer that those same defendants were acting "under color of state law."  *See Plaats v. Barthelemy*, No. 15-3342, 2016 WL 2642056, at *2 (7th Cir. May 4, 2016).

Plaintiffs here specifically argue that Defendant Zielinski acted "under color of state law" pursuant to the "joint participation" test. Pls. Resp. to Jan Zielinski's Supple. Br. [107] at *3. Accordingly, this Court will analyze Plaintiffs' Section 1983 claims against Zielinski pursuant to the "joint participation" test, while remaining mindful of the Supreme Court's admonition that our inquiry is context-dependent. *See Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295-96 (1999) ("[W]hat is fairly attributable [to a private actor] is a matter of normative judgment, and the criteria lack rigid simplicity . . . no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.").

Under the "joint participation" test, "a private party may be liable under section 1983 if he conspires or acts in concert with a state actor to deprive an individual of constitutional rights." *Latosky v. Strunc*, No. 08-C-771, 2009 WL 1073680, at *8 (E.D. Wis. Apr. 21, 2009). This standard finds its doctrinal roots in "traditional principles of agency, partnership, joint venture and the like." *Nesmith v. Alford*, 318 F.2d 110, 126 (5th Cir. 1963). As first recognized by the Supreme Court in *Adickes v. S.H. Kress & Co.*, the "joint participation" test requires a plaintiff to show that the private actor defendant actually conspired with state actors to deprive the plaintiff of her civil rights. 398 U.S. 144, 157-58 (1970) ("[A] private party involved in . . . a conspiracy, even though not an official of the State, can be liable under § 1983."). Modern courts have retained *Adickes*' focus on the

level of coordination between the state actors and the private entity. *See, e.g., Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998) ("For an individual to act under color of law, there must be evidence of a *concerted effort* between a state actor and that individual.") (emphasis in original).

To be sure, courts applying the "joint participation" test have previously found certain defendant-landlords amenable to suit under Section 1983. For example, in *Latosky v. Stunc* a sister court in this circuit determined that a reasonable jury could infer that the defendant-landlord had acted "under color of state law" by utilizing the local police force during an eviction. 2009 WL 1073680, at *1. The police officers in *Latosky, inter alia,* broke down the door of plaintiff's apartment; entered the apartment, while plaintiff was present and over his objection; stunned plaintiff with a taser; handcuffed plaintiff; and forcibly removed plaintiff from the apartment. *Id.* at *9. What is more, the officers in *Latosky* behaved this way "even though they knew at the time [that defendant-landlord] had no judgment or order of eviction." *Id.* at *10. The Court concluded that those facts were sufficient "to support an inference that [defendant-landlord] and the police acted in concert to deprive [plaintiff] of possession of his apartment." *Id.* at *9.

The undisputed facts in this case are decidedly different. On the afternoon of June 2, 2013, the Zielinskis contacted the police department to request a "premises check" confirming that Plaintiffs had vacated the Apartment. *See supra* at *4. When no one answered, Zielinski entered the Apartment with Officers Conrad and Bunkowski. *Id.* At around 9:30 p.m. that same night, Zielinski observed that the

Apartment's door had been broken and asked that police officers return to perform another "premises check." *Id.* at *8. After this second premises check confirmed that the Apartment was empty once again, Zielinski and his son changed the locks on the Apartment at the suggestion of law enforcement.[4] *Id.* Finally, on June 4, 2013, Amanda Wozniak summoned Officer Murphy to the Apartment, where he attempted to negotiate a resolution between Plaintiffs and Zielinski. *Id.*

Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (internal quotations omitted). At this point, Plaintiffs are required to adduce adequate evidence of a "sufficient nexus" between the Officer Defendants and Zielinski that the latter's actions "may be fairly treated as that of the State itself." *See Rodriguez*, 577 F.3d at 823–24 (7th Cir. 2009) (internal quotation omitted). Based upon these facts, even after drawing all reasonable inferences in Plaintiffs' favor, this Court finds that there is no legitimate basis to conclude, under the joint participation test, that Zielinkski was acting "under color of state law."

Neither "premises check" of the seemingly-abandoned Apartment evidences the requisite "concerted effort" between the Officer Defendants and Zielinski. *Fries*, 146 F.3d at 457. As a preliminary matter, each "premises check" was initiated when Frank Zielinski, not Defendant Jan Zielinski, called the JPD. *See supra* at *4;

---

[4] There is a disputed factual question as to whether Zielinski changed the locks on the Apartment under the orders of a police officer. *Id.* at *8-9. However, for the purpose of resolving the present motions, the Court assumes that a police officer from the Village of Justice instructed Zielinski to change the locks at the Apartment.

*see also* DSOF Ex. 15. At most, the undisputed facts show that Defendant Jan Zielinski met with the responding officers and entered the Apartment, after the officers determined that the Apartment was empty. *See supra* at \*4-8. On such facts, no reasonable factfinder could determine that Defendant Jan Zielinski somehow was acting "under color" of state law.

This conclusion remains the same even assuming that Zielinski changed the locks on the Apartment at the suggestion of law enforcement. The Supreme Court has consistently reminded us that application of the state action doctrine is a context-driven endeavor. *See Brentwood Acad.*, 531 U.S. at 295-96. In this particular context, no reasonable fact finder could infer that Zielinski's decision to change the locks was "fairly attributable" to the State. Here, the undisputed portions of the record show that the locks were changed only after Zielinski confirmed the Apartment was empty after two "premises checks" and the door to the Apartment had been broken. *See supra* at \*4-8. Changing the locks on a seemingly-abandoned apartment with broken doors is a common-sense precaution, not state action, and that remains true even if the initial suggestion to change the locks might have been made by a local police officer. *See Beyer v. Vill. of Ashwaubenon*, 444 F. App'x 99, 101 (7th Cir. 2011) ("When, as here, the state has not *compelled* a private act—when the impetus and the actors remain private— there is no state action.") (emphasis added). Moreover, the undisputed record also shows that the locks were changed at a time when the Apartment was filthy, empty, and already subject to an Agreed Order for Possession. *See supra* at \*4-5. In short,

the decision to change the locks was entirely consistent with a landlord's standard business practices and cannot "be fairly treated as that of the State itself." *See Rodriguez*, 577 F.3d at 823-24 (7th Cir. 2009) (internal quotation omitted).

Likewise, no viable claim arises from the undisputed facts regarding the events of June 4, 2013. The parties agree that on June 4 Amanda Wozniak, not Zielinski, summoned the police to the Apartment. *See supra* at *9. The parties similarly agree that once Officer Murphy arrived, he attempted to negotiate a mutually beneficial resolution and left after Plaintiffs had gained access to the Apartment. *Id.* Given the foregoing, no reasonable fact-finder could conclude that Zielinski and the Officer Defendants were working in "concert" on that day.

Because the Court finds that no reasonable fact-finder could infer that Defendant Zielinski acted "under the color of state law," he is not susceptible to claims made pursuant to Section 1983. Accordingly, the Court grants Defendant Zielinski's motion for summary judgment as to Claims 1, 2 and 3.

**B.    Plaintiffs' Section 1983 Claims Against The Officer Defendants Also Fail**

Based upon the briefing, the Officer Defendants have not contested that they were acting "under color of state law" at all relevant times. The Court therefore proceeds to the second prong of the fundamental inquiry for Section 1983 claims— whether Plaintiffs suffered a violation of their rights under the Constitution or laws of the United States.

The Fourth Amendment, applicable to the States through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons . . .

18

against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Plaintiffs claim that the Officer Defendants violated this prohibition by: (1) "seizing" the Apartment on June 2, 2013 (Count I); (2) "seizing" the persons of Amanda Wozniak and certain of her children when, on June 4, 2013, the Officer Defendants prevented them from entering the Apartment (Count II); (3) "searching" the Apartment on June 2, 2013 (Count III); and (4) "seizing" the Plaintiffs' animals on June 2, 2013 (Count IV). The Officer Defendants deny that any constitutional violations took place. Alternatively, the Officer Defendants contend that they are entitled to qualified immunity for any putative violations.

The Court must first consider whether the Plaintiffs owned a sufficient possessory interest in the Apartment to pursue a Fourth Amendment claim arising from the contested searches and seizures. *See Siebert v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001); *McKinney v. Moutesdeoca*, No. 11-cv-1433, 2012 WL 6060946, at *5 (N.D. Ill. Dec. 6, 2012). On May 7, 2013, the Circuit Court of Cook County entered an Agreed Order for Possession in which it instructed Zielinski to "have and recover of and from, [the Wozniaks], the possession of" the Apartment. *See supra* at *5. Per the Agreed Order for Possession, Zielinski was entitled to possession on May 27, 2013. *Id.* Thus, it appears that—at the time of the alleged seizures—Zielinski was legally entitled to possession of the Apartment, such that Plaintiffs had no "possessory interest." The Village Defendants pursue a similar line of argument in their motion for summary judgment, insisting that because Plaintiffs abandoned the Apartment, Zielinski and the Officer Defendants were entitled to enter as they

pleased.  Village Defs. Mot. Summ. J. [79] at *5.  In response, however, Plaintiffs have presented evidence from which a reasonable factfinder could infer that: (1) Zielinski verbally consented to the Plaintiffs remaining in possession of the Apartment for a time period including the dates at issue here; and that (2) Plaintiffs had not yet entirely abandoned the Apartment (or the animals inside).  *See supra* at *4-7.  Defendants contest the veracity of this evidence, but summary judgment is not the appropriate means of resolving such a dispute.  Therefore, for the purpose of resolving the present motions, Plaintiffs had a sufficient possessory interest in, and had not in fact entirely abandoned, either the Apartment or their animals on June 2, 2013.  The Court now turns to the substantive allegations.

### 1.    Counts I and III–Search & Seizure of Apartment[5]

Based upon the record at this stage of the proceedings, the Officer Defendants did not violate the Fourth Amendment on June 2, 2013.  Moreover, even if a Fourth Amendment violation had occurred, the Officer Defendants are nevertheless entitled to qualified immunity (and thus summary judgment) on Counts I and III.

### a)    The Qualified Immunity Standard

Qualified immunity protects defendants when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *See Beaman v. Freesmeyer,* 776 F.3d 500, 508 (7th Cir. 2015).  A court must answer two questions to determine if qualified immunity applies.  First,

---

[5] Counts I and III concern the seizure and search, respectively, of the Apartment by Officer Defendants; accordingly, the Court will consider them together.

would a constitutional right "have been violated" in this situation? *Viilo v. Eyre,* 547 F.3d 707, 710 (7th Cir. 2008) (internal quotations omitted). Second, a court must ask "whether the right at issue was clearly established at the time and under the circumstances presented." *Beaman,* 776 F.3d at 508. Here, Plaintiffs fail to clear the first hurdle.

### i. Plaintiffs' Rights Were Not Violated

Under the first prong, this Court must decide whether the Plaintiff has shown facts that "make out a violation of a constitutional right." *Pearson v. Callahan,* 555 U.S. 223, 232 (2009). Specifically, this Court must determine: (1) whether the Officer Defendants "searched" or "seized" the Apartment within the meaning of the Fourth Amendment; and (2) whether the putative search and search were unreasonable. *See Belcher v. Norton,* 497 F.3d 742, 747 (7th Cir. 2007).

### a) The Officer Defendants "Searched" And "Seized" The Apartment

Based upon the record presented, the Officer Defendants clearly conducted a search and seizure of the Apartment on June 2, 2013. A seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County,* 506 U.S. 56, 61 (1992) (internal quotation omitted). Even "temporary seizures are within the scope of the Fourth Amendment, so long as there is some meaningful interference with an individual's possessory interest." *Congine v. Vill. of Crivitz*, 947 F. Supp. 2d 963, 974 (E.D. Wis. 2013) (internal quotation omitted). Similarly, exercising control over a plaintiff's property can qualify as "meaningful interference" even when the plaintiff is not

present at the time.  *Id.*  ("[T]he absence of [plaintiff's] physical presence at the time of the seizure is irrelevant—the fact that [plaintiff] was not in town cannot mean that his Fourth Amendment rights left town with him.").  Likewise, when the government physically occupies "private property for the purpose of obtaining information," it has performed a search.  *United States v. Jones*, 132 S. Ct. 945, 949 (2012).  Indeed, the Officer Defendants concede that they "physically occupied" the Apartment "for the purpose of obtaining information," *i.e.*, to determine if the Apartment was abandoned.  *See supra* at *4-5.

### b) The Officer Defendants' Search and Seizure of The Apartment Was Reasonable.

Even drawing all reasonable inferences in Plaintiffs' favor, this Court finds that no rational juror could conclude that the Officer Defendants conducted an unlawful search and seizure of the Apartment.  *See Green v. Butler,* 420 F.3d 689, 694 (7th Cir. 2005) (The touchstone of Fourth Amendment liability is reasonableness); *Ferrell v. Soto*, No. 06-cv-5382, 2008 WL 342957, at *6 (N.D. Ill. Feb. 5, 2008) (courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.") (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989).

In this case the Officer Defendants were presented with an Agreed Order for Possession, signed by Plaintiff Robert Wozniak himself, which indicated that Plaintiffs no longer had an expectation of privacy in the Apartment.  *See supra* at *4; *United States v. Curlin*, 638 F.3d 562, 566 (7th Cir. 2011) ("[G]iven that Curlin had notice that his continued occupancy had been adjudged to be unlawful, we have

no difficulty concluding that he lacked any objectively reasonable expectation of privacy in the premises."); *see also United States v. Rambo,* 789 F.2d 1289, 1295-96 (8th Cir. 1986) (hotel occupant who was asked to leave by police officers acting on behalf of hotel management no longer had a reasonable expectation of privacy in the hotel room).

Moreover, the undisputed portions of the record confirm that the intrusion imposed here was both short in duration and limited in nature. *See supra* at *4-7. In fact, the Officer Defendants entered the Apartment for administrative, rather than investigatory, purposes; and federal courts have long recognized that the "routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime." *Camara v. Mun. Ct. of S.F.,* 387 U.S. 523, 530 (1967); *see also Widgren v. Maple Grove Twp.*, 429 F.3d 575, 584 (6th Cir. 2005) (observing that administrative searches are "less of an intrusion on personal privacy and dignity than that which generally occurs in the course of criminal investigation. This is a real and meaningful distinction.") (internal quotation omitted); *Davis v. City of Milwaukee*, No. 13-cv-982, 2015 WL 5010459, at *10-11 (E.D. Wis. Aug. 21, 2015), *aff'd*, No. 15-2978, 2016 WL 2870035 (7th Cir. May 17, 2016) (publication forthcoming) ("[T]he searches at issue here were administrative and regulatory—and not criminal—and thus were by nature less intrusive.").

Balancing this short intrusion against the strong governmental interest in peacekeeping and the enforcement of judicial orders, the Officer Defendants'

conduct remains lawful. Premises "checks" (like those here) serve an important peacekeeping function. Failing landlord-tenant relationships can often become contentious and the government has a strong interest in making police officers available in situations where violence is a possibility. *See* 65 Ill. Comp. Stat. 5/11-1-2 ("Police officers in municipalities shall be conservators of the peace."); *see also City of Chicago v. Morales,* 527 U.S. 41, 106–07, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Thomas, J., dissenting) ("Police officers are not, and have never been, simply enforcers of the criminal law. They wear other hats—importantly, they have long been vested with the responsibility for preserving the public peace."); *United States v. Fern*, 484 F.2d 666, 668 (7th Cir. 1973) ("The governmental interest includes not only the prevention of crime, but also the protection of the officer and other prospective victims of violence.") (internal quotation omitted). More generally, the government also possesses a strong interest in the efficient enforcement of judicial orders, like the Agreed Order for Possession at issue in this case. In sum, this Court concludes that undisputed portions of the record show that no constitutional violation occurred as a matter of law. As to the Officer Defendants, this determination alone resolves Counts I and III, and this Court need not consider the second prong of the qualified immunity analysis.

### 2.    **Count II–Seizure of Person**

To determine whether the Officer Defendants violated the Fourth Amendment by unconstitutionally seizing Plaintiffs' persons, this Court must: (1)

determine whether a "seizure" of person has taken place; and (2) determine whether any putative seizure was unreasonable.

### a) Plaintiffs Were Not "Seized"

A person has been seized within the meaning of the Fourth Amendment "'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). The Seventh Circuit has identified "two overarching themes" which inform our seizure analysis: "(1) the nature and degree of the official inducement, and (2) the extent of the restrictions on the citizen's desired freedom of movement." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1178 (7th Cir. 1994). These broad themes are buttressed by a number of more specific factors to consider, including whether:

> [T]he encounter took place in a public place or whether police removed the person to another location; whether the police told the person he was not under arrest and was free to leave; whether the police informed the person that he was suspected of a crime or the target of an investigation; whether the person was deprived of identification or other documents without which he could not leave (such as a driver's license or train or airline ticket); and whether there was any limitation of the person's movement such as physical touching, display of a weapon, or other coercive conduct on the part of the police that indicates cooperation is required.

*Tyler*, 512 F.3d at 410 (7th Cir. 2008).

None of these factors are implicated by the undisputed facts. At no point were Plaintiffs removed to another location, told they were under arrest, informed

that they were suspected of a crime, deprived of identification or physically touched. *See supra* at *4-7.

Plaintiffs nevertheless argue that the Officer Defendants unconstitutionally seized their persons in violation of the Fourth Amendment by "interfer[ing] with [the] lawful resident[s'] right to occupy [their] home." Pls.' Mot. Summ. J. [84] at *5. The only factual allegations relating to the Officer Defendants on this point concern Officer Murphy and the unidentified dispatcher during the July 4, 2013 incident, who ostensibly "denied" Mrs. Wozniak access to the Apartment. *Id.* at *6.

Plaintiffs acknowledge that their theory represents a novel expansion of existing Seventh Circuit precedent. *Id.* at *5. Nevertheless, they argue that this expansion is justified in light of the reasoning contained in *Hebert v. Reynolds*, 2:07-cv-91, 2009 WL 3010510 (N.D. Ind. Sept. 15, 2009), and *Lunini v. Grayeb*, 305 F. Supp. 2d 893 (C.D. Ill. 2004), *rev'd in part*, 395 F.3d 761 (7th Cir. 2005), *as amended on denial of reh'g and reh'g en banc* (Mar. 4, 2005). Plaintiffs' reliance on these cases, however, is misplaced.

As a legal matter, the question of whether a seizure has occurred when police officers merely instruct an individual to leave their home "remains unresolved." *Hebert*, 2009 WL 3010510, at *5. The Seventh Circuit first took up this question in *Kernats v. O'Sullivan*, 35 F.3d 1171 (7th Cir. 1994). *Kernats* was initiated by tenants of a leased home who sued a police officer after he ordered the tenants to leave by the end of the day or face arrest. *Id.* at 1173-74. The Seventh Circuit could not reach consensus as to whether the tenants were "seized" under these

circumstances, and eventually issued three separate opinions on that issue. *Id.* at 1178-85. More recent decisions have been similarly unclear. *See White v. City of Markham,* 310 F.3d 989, 995 (7th Cir. 2002) ("[U]nder [a similar] factual scenario, when the plaintiffs were free to leave and thereby terminate the encounter at any time[,] it is unclear whether a seizure occurred."); *see also Lumini v. Grayeb,* 184 Fed. App'x 559, 562 (7th Cir. 2006) ("Even if [plaintiff] was seized [when he was ordered to leave his home], the seizure was not unreasonable.").

As a factual matter, however, each of these cases is distinguishable, and thus, this Court need not address the "unresolved" question in *Hebert* involving instances where the police removed plaintiffs from their <u>current</u> residences. *Hebert*, 2009 WL 3010510, at *1 ("At approximately 1:30 a.m., the officers arrived at Hebert's house and started banging on his door."); *Lunini*, 205 F. Supp. 2d at 906 ("[I]t is undisputed that Lunini had lived in the house for approximately two years [and] was living in the High Street Residence."); *Kernats*, 35 F.3d at 1174; *White*, 310 F.3d at 991 (finding that plaintiffs "lived in" the residence from which they were removed). In contrast, none of the Plaintiffs here were currently residing at the Apartment by June 4, 2013, and instead, according to Amanda Wozniak, they simply returned to the Apartment on that date "to try to get access to [their] stuff." PSOF Ex. B at 85:4-5.

Consequently, based upon the record above, this Court finds that Plaintiffs' persons were not seized, as a matter of law, on June 4, 2013.

### b) Any Ostensible Seizure Was Reasonable

Even if a seizure did take place here, this Court finds that any such seizure remained lawful under the Fourth Amendment.

As previously mentioned, every time the Seventh Circuit has been faced with a similar fact pattern, it has determined that the putative seizure was reasonable as a matter of law. *White*, 310 F.3d at 991; *Kernats*, 35 F.3d at 1174; *Lumini*, 184 Fed. App'x at 562. In each of these cases, the court noted that the officer-defendants' actions were reasonable because, *inter alia*, the officer privileged the individual with the apparently-superior property interest. *See Lumini*, 184 Fed. App'x at 562 ("The officers' decision to order Lunini to leave the house was reasonable since he appeared to have the inferior possessory interest in the property."); *White*, 310 F.3d at 996 ("[I]t could not have been unreasonable for Officer Muldrow to request White, the family member with the apparently inferior property interest in remaining on the premises, to vacate the explosive situation."); *Kernats*, 35 F.3d at 1184 ("If they did not have a cognizable interest in staying, then they have no constitutional claim against Officer O'Sullivan, as reprehensible and unprofessional as his threats may have been.") (Crabb, C.J., concurring).

In this case, the undisputed portions of the record show that by June 4, Plaintiffs had signed an Agreed Order for Possession regarding the Apartment. *See supra* at *4. Under the logic of *Kernats*, *Lunini* and *White*, it was eminently reasonable for the Officer Defendants to privilege Zielinski's seemingly-superior property interest while resolving the June 4 dispute. Thus, even if Plaintiffs'

persons had been seized on that day, the seizure would have been reasonable as a matter of law. Because there was no seizure of Plaintiffs' persons and any putative seizure would have been reasonable, the Officer Defendants are entitled to summary judgment on Count II.[6]

### 3.    Count IV–Seizure of Animals

Here again, to determine whether the Officer Defendants violated the Fourth Amendment by seizing Plaintiffs' animals, this Court must determine: (1) whether the Officer Defendants "seized" the animals within the meaning of the Fourth Amendment; and (2) whether the putative seizure was unreasonable. *See Belcher v. Norton,* 497 F.3d at 747.

### a)    The Officer Defendants "Seized" The Animals

Based upon the undisputed facts, the Officer Defendants seized the animals referenced in Count IV. *Ferrell v. Soto*, No. 06-cv-5382, 2008 WL 342957, at *5 (N.D. Ill. Feb. 5, 2008) ("[I]f the Fourth Amendment protects [the mere seizure of] a person's television set and couch, dogs [and guinea pigs] fall under this same analysis."). Drawing the inference that Plaintiffs had not actually abandoned the animals, this Court notes that the Officer Defendants removed the animals from the Apartment and took them to the local animal control center. *See supra* at *6.

---

[6] Because this Court concludes that Plaintiffs were not seized and any ostensible seizure would have been reasonable, the Court does not need to address the Officer Defendants' qualified immunity defense with respect to Count II.

### b) The Officer Defendants' Seizure of The Animals Was Reasonable

To determine whether the Officer Defendants' seizure of the animals was reasonable this Court must "balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Ferrell*, 2008 WL 342957, at *6 (internal quotation omitted). Even drawing all reasonable inferences in Plaintiffs' favor, no rational juror could find in favor of the Plaintiffs. Here, the animals were only removed for a short period of time, and the seizure was made for administrative, rather than investigatory, purposes. *See supra* at *4-7. In fact, most of the cases in which courts have determined that dogs fall within the purview of the Fourth Amendment concern animals which had been destroyed. *See Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008); *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose,* 402 F.3d 962, 975 (9th Cir. 2005); *Altman v. City of High Point,* 330 F.3d 194, 204-05 (4th Cir. 2003); *Brown v. Muhlenberg Twp.,* 269 F.3d 205, 210 (3d Cir. 2001). These cases are a stark contrast to the seizure here, which separated Plaintiffs from their animals for the span of an afternoon.

Additionally, the government has a compelling interest in safe and responsible pet supervision. *See Altman*, 330 F.3d at 205 ("Dogs may harass or attack people, livestock, or other pets. Dogs can maim or even kill. Dogs may also spread disease or cause property damage."). Indeed, the Village of Justice Code specifically provides that a "police officer may impound . . . any abandoned animal . . . [or] dog . . . not wearing a collar and license tag within the limits of the village."

30

Vill. of Justice Code §§ 7-96, 7-126 (2015); *see also* 510 Ill. Comp. Stat. 70/3.01 ("No owner may abandon any animal where it may become a public charge or may suffer injury, hunger or exposure."). When the Officer Defendants took the animals, they were alone in a filthy apartment, with limited food and water, and two dogs were sharing a single cage. *See supra* at *5-7. Given the modest nature of the intrusion and the government's strong interest in ensuring that animals are treated properly, the Officer Defendants' seizure of the animals was reasonable.[7]

Accordingly, based upon the undisputed factual record, the Officer Defendants are entitled to summary judgment on Count IV.

### C. Plaintiffs' *Monell* Claims Fall Because There Was No Underlying Constitutional Injury

Given the foregoing analysis, Plaintiffs' claims against each of the Officer Defendants are dismissed with prejudice. In most federal Circuits, this determination would be necessarily fatal to Plaintiffs' *Monell* claims against the Village of Justice pursuant to *City of Los Angeles v. Heller*, 475 U.S. 796 (1986). In that case, the Supreme Court determined that if a defendant police officer "inflicted no constitutional injury on [Mr. Heller], it is inconceivable that [the remaining defendants] could be liable to [him]." *Id.* at 799. The Court went on to state that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *Id.*

---

[7] Because this Court concludes that the seizure of the animals was reasonable, the Court does not need to address the Officer Defendants' qualified immunity defense with respect to Count IV.

The Seventh Circuit has narrowly interpreted *Heller,* however, and held that "a municipality can be held liable under *Monell,* even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Hart v. Mannina*, 992 F. Supp. 2d 896, 912 (S.D. Ind. 2014), *aff'd*, 798 F.3d 578 (7th Cir. 2015) (emphasis in original, internal quotation omitted). To determine whether the Village's liability is dependent on the Officer Defendants, the courts look to "the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Terry v. Cook Cty. Dep't of Corr.*, No. 09-cv-3093, 2010 WL 2720754, at *2 (N.D. Ill. July 8, 2010) (internal quotation omitted).

In this case, the nature of the offenses are such that by ruling in the Officer Defendants' favor, Plaintiffs' claims against the Village of Justice are foreclosed. *See Evans v. City of Chicago*, No. 10-cv-542, 2010 WL 3075651, at *4 (N.D. Ill. Aug. 5, 2010) ("Both [*Heller* and *Thomas*] turn on whether a jury verdict clearing individual agents from liability necessitates a conclusion that no violation of constitutional rights actually occurred. Because there must be a constitutional injury for liability under § 1983, a finding of no constitutional injury relieves a municipality from liability."). Here the Officer Defendants actions were alleged to be the "source of the alleged harm . . . and any 'policy' [would have] exerted harm through these actions, not independently of them." *See Veal v. Kachiroubas,* No. 12 C 8342, 2014 WL 321708, at *4 (N.D. Ill. Jan. 29, 2014) (internal quotations omitted). Accordingly, entry of summary judgment is appropriate on Plaintiffs' *Monell* claims.

**D.    The Court Declines To Exercise Supplemental Jurisdiction Over Plaintiffs' Remaining State Law Claims**

The "general rule is that, when all federal-law claims are dismissed before trial," the pendent claims should be left to the state courts.  *Wright v. Associated Insurance Cos. Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994).  When determining how to best exercise its discretion regarding the application of this general rule, the Court considers "the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources," among other factors.  *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994).  Given the fact that Plaintiffs' federal claims have been dismissed before trial, the fairly routine nature of the state law claims at issue, and the ease with which an Illinois court can address those remaining state law claims, this Court declines to exercise its supplemental jurisdiction over Plaintiffs' remaining state law claims.

## IV.    Conclusion

In light of the foregoing, Plaintiffs' Motion for Summary Judgment [84] is denied.    Defendant Zielinski's Motion to Join and for Summary Judgment [83] is granted in part (as to the request to join and Counts 1-3) and denied as moot in part (as to Counts 10-15).    The Village Defendants' Motion for Summary Judgment [79] is granted.    Counts 1-8 are dismissed with prejudice.    Counts 9-15 are dismissed without prejudice, as this Court declines to exercise supplemental jurisdiction over the same.    Civil case terminated.

IT IS SO ORDERED

Dated: September 26, 2016.

Entered:

John Robert Blakey
United States District Judge